35-013-10

S. A. Andretta,
Administrative Assistant Attorney General

J. Lee Rankin, Assistant Attorney General,
Office of Legal Counsel

Payment of compensation to individual in receipt of compensation
from a foreign government (Mr. Richard E. Newkirk, OAP).

OCT  4 1954

This is in reply to your memorandum of August 24, 1954, in which you inquire whether any law or regulation prevents the payment of salary to Mr. Richard E. Newkirk, in view of the fact that he receives an annuity from the Government of Hessen, Germany, and at the same time is employed by the Office of Alien Property of the Department of Justice.

## STATEMENT

Mr. Richard E. Newkirk was re-employed by the Office of Alien Property on July 26, 1954, on a 3-month W.A.E. contract as an Attorney Adviser, G-13. Subject to security clearance, it is expected that he will receive a temporary-indefinite appointment at the expiration of his present contract at the same grade and salary. He is assigned to the Claims Branch, where his principal duty is to make recommendations with respect to claims to vested property.

Until June 26, 1933, Mr. Newkirk was a judge at the Court of Common Pleas in Kassel, Germany. At that time he was involuntarily retired, effective October 1, 1933, by the National-Socialist Government for racial reasons. In 1936, Mr. Newkirk emigrated to the United States, where he has since resided and become a naturalized citizen.

The German Government on May 11, 1951, enacted a law entitled "Law on Indemnification of National-Socialist Wrong with Relation to Civil Servants". (This law, a translation, and other relevant documents are attached and should be made a part of the file.) Pursuant to its terms, a German civil servant, who was prematurely retired by reason of persecution for racial or religious reasons under the National-Socialist Government, was granted a right of re-employment or retirement at the status and salary he probably would have reached had he not been prematurely retired. The period between dismissal and reappointment or retirement is regarded as a period of actual service for purposes of computing an annuity, and such annuity is payable for the period one year prior to the effective date of the law (April 1, 1950) to the date of re-employment or retirement and thereafter for life. As originally enacted, this law was inapplicable to persecutees living abroad.

On March 18, 1952, the law was amended to provide that persecutees living abroad were eligible to claim under the act, provided the claimant had taken up

permanent residence abroad prior to May 24, 1949, and provided further that the Government of his residence maintained diplomatic relations with the Republic of Germany.

Mr. Newkirk filed a claim in which he elected to retire rather than seek re-employment. His claim was allowed on February 16, 1954, pursuant to which he draws a monthly annuity of $263.00 for life, effective April 1, 1950.

Mr. Newkirk also filed a claim under the Hessian Law on Indemnification of August 10, 1949, covering the period from 1933 to 1950 for damages by reason of his premature retirement. That claim has also been allowed in the amount of DM 14,963.92 or approximately $4,000.00, of which he has been paid IM 5000, less IM 500 for taxes, or approximately $1,300. The remainder will be paid when money is appropriated for that purpose.

On July 28, 1954, two days after his re-employment, Mr. Newkirk summarized the foregoing facts in a memorandum to the Chief of the Claims Branch. This office has been asked to determine whether the receipt of these payments is consistent with his continued employment in the Department of Justice.

## LAW INVOLVED

Article I, section 9, clause 8, of the Constitution is the only relevant law and provides, in part, -

> "* * * no person holding any office of profit or trust under them [the United States], shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign State."

## QUESTIONS PRESENTED

1. Is Mr. Newkirk by virtue of his employment as an Attorney Adviser in the Office of Alien Property holding an "office of profit or trust" under the United States?

2. If the answer to the first question is in the affirmative, is Mr. Newkirk by virtue of receiving a monthly annuity from the Hessian Government of the Republic of Germany accepting "any present, emolument, office, or title, of any kind whatever" from a foreign State?

## OPINION

1. **Is Mr. Newkirk by virtue of his employment as an Attorney Adviser in the Office of Alien Property holding an "office of profit or trust" under the United States?**

The question "who is a person holding an office of profit or trust under the United States within the meaning of Article I, section 9, clause 8, of the

Constitution" has been the subject of two opinions of the Attorney General, which, in my opinion, spell out the considerations which control the instant case.

In 27 Ops. A.G. 219, the question was raised whether a clerk of Class 4 in the Post Office Department could accept the insignia of the third class of the Order of the Red Eagle conferred upon him by the German Emperor. In holding that in the absence of consent from Congress the individual was inhibited from accepting the insignia, Attorney General Wickersham said:

> "* * * It therefore appears that Mr. Brooks holds his appointment from the head of a Department, that he receives for his services a fixed compensation from moneys appropriated for the purpose by Congress, that he has regularly prescribed services to perform, and his duties are continuing and permanent, and not occasional and temporary. He is, therefore, an inferior officer of the United States within the meaning of that clause of Article II, section 2, of the Constitution, which provides that 'Congress may, by law, vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of Departments.' (United States v. McCrory, 91 Fed. 295; United States v. Germaine, 99 U.S. 508; Hall v. Wisconsin, 103 U.S. 5, 8; United States v. Hartwell, 6 Wall. 385; United States v. Hendee, 124 U.S. 312.)

> "It follows, therefore, that in the absence of a special consent obtained from Congress, Mr. Brooks is inhibited from accepting the insignia in question, by the last clause of Article I, section 9, of the Constitution, which provides that 'No person holding any office of profit or trust under them [the United States], shall, without consent of the Congress, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign state!'"

On the other hand, in 28 Ops. A.G. 598, Attorney General Wickersham held that a special assistant on the United States Geological Survey could accept from the King of Sweden the order of the "Knighthood of the North Star" because he was found not to be an officer within the meaning of Article I, section 9, clause 8, of the Constitution. In so holding, the Attorney General relied on the following facts:

> "He was employed under Civil-Service Rule VIII as field assistant, grade four (designated as special agent in this case);

> "He is employed by the chief geologist, with the approval of the director, under authority of the Civil Service Commission;

"His work is indefinite in term, his employment being from time to time during the year, with the limitation that the compensation is not to exceed $300 in any one year;

"He is paid by the day when actually employed, at $5 per day;

"He does not take any oath of office, and, in reply to the question: 'Do his duties require a continuous service, or only as they may be occasionally called for by his superior?' the answer is: 'Only occasional work.'

"Under these conditions I am of the opinion that Professor Udden can not be called an officer under the United States within the meaning of the provision above quoted. (United States v. Germaine, 99 U.S. 508.)"

I have no hesitation in concluding that an Attorney Adviser, G-13, is an inferior officer of the United States and holds an office of profit or trust. Mr. Newkirk was appointed by the Attorney General, the head of a department[1]/ he took the oath prescribed for all persons appointed "to any office of honor or profit[2]/ he is employed full time at a fixed salary, presently on a "when actually employed" basis, but with the understanding that it will be converted to a temporary-indefinite appointment at such time as his security clearance is obtained. In short, the position Mr. Newkirk holds satisfies the tests laid down by the Court in United States v. Germaine, 99 U.S. 508, and by the Attorney General in 27 Ops. A.G. 219, for determining officer status.[3]/

## FN1

---

1/ 5 U.S.C. 43, 22a. The fact that the Attorney General has delegated this function to the Deputy Attorney General (see Order No. 3732, Supp. 52, 58) makes his appointment nonetheless that of the head of the Department.

## FN2

2/ 5 U.S.C. 16.

## FN3

3/ And see, United States v. Hartwell, 6 Wall. 385, 393, where the Court defined office as follows:

"An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties.

"The employment of the defendant was in the public service of the United States. He was appointed pursuant to law, and his compensation was fixed by law. Vacating the office of his superior would not have affected the tenure of his place. His duties were continuing and permanent, not occasional or temporary. They were to be such as his superior in office should prescribe.

"A government office is different from a government contract. The latter from its nature is necessarily limited in its duration and specific in its objects. The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other."

Moreover, the term "office of profit or trust" or similar language appears in several sections of the Constitution in contexts which quite clearly disclose that the category of positions involved was not intended to be given a narrow construction. Article I, section 3, clause 7, provides that "judgment in cases of impeachment shall not extend further than to removal from office, and disqualification to hold and enjoy any office of honor, trust or profit under the United States * * *." Article VI, section 3, provides that "* * * no religious test shall ever be required as a qualification to any office or public trust under the United States." Surely the drafters of the Constitution did not intend that an impeached person could thereafter secure employment with the Government or that a religious oath could be attached to governmental offices other than those occupied by "officers" in a narrow sense of the word. Patently, the provision of the Constitution under consideration was designed to require undivided loyalty from all persons holding positions of trust or profit under the United States and should not be narrowly construed./4/

I have examined the opinion of January 20, 1954, of the Labor Department, which reaches a contrary conclusion with respect to an individual employed by that Department. The opinion (copy attached) does not set forth the facts concerning the position occupied by the individual involved, but the authorities there cited are not inconsistent with the conclusion that an Attorney Adviser in the Department of Justice occupies a position of "honor or trust under the United States"./5/

---

/4/ Article VI of the Articles of Confederation is the forerunner of Article I, section 9, clause 8, of the Constitution, and is in haec verba. In the first printed form of the Articles of Confederation, the clause read:

"Nor shall any Colony or Colonies, nor any Servant or Servants of the United States, or of any Colony or Colonies, accept of any Present, Emolument, Office or Title of any kind whatever, from the King or Kingdom of Great Britian, or any foreign Prince or State." (Underscoring supplied.)

While there is no explanatory statement concerning the changes made in the final form, this earliest form lends support to the conclusion that the clause was intended to have broad coverage.

/5/ Numerous statutes describe attorneys of the Department of Justice as "officers" (see e.g., 5 U.S.C. §§ 49, 302, 306, 309, 310, 311, 316). And see the Appendix to 40 Ops. A.G. 294, 300, where Attorney General Gregory said with respect to attorneys employed by the Alien Property Custodian: "No doubt there is room for the contention that the attorneys * * * in your service are neither 'officers of the United States' nor hold places 'under any Executive Department * * *.' As prosecuting officer, however, I could not adopt so narrow a view * * *." Since that opinion, the Office of Alien Property has been placed in the Department of Justice.

- 6 -

II. **Is Mr. Newkirk, by virtue of receiving a monthly annuity from the Russian Government, accepting "any present, emolument, office, or title of any kind whatever" from a foreign State?**

The answer to this question depends upon what was intended by "emolument", for quite clearly the payments are from a foreign State, and it is equally clear that no present or office or title is involved.

The question is novel and not free from doubt. I have found no authority construing the term "emolument" as used in the Constitution. The historical material, however, discloses that the purpose of the clause was to prevent corruption and foreign influence. In 3 Farrand, Records of the Federal Convention of 1787, p. 327, there appears the following explanatory remarks concerning the clause:

"The last restriction restrains any persons in office from accepting of any present or emolument, title or office, from any foreign prince or state. It must have been observed before, that though the confederation had restricted congress from exercising any powers not given them, yet they inserted it, not from any apprehension of usurpation, but for greater security. This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened, operated in producing the restriction. A box was presented to our ambassador by the king of our allies.(b) It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states. I believe, that if at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war. * * *"

##FN6

(b) "'Dr. Franklin is the person alluded to by Randolph. In the winter of 1756, in Philadelphia, under the roof of a venerable granddaughter of Dr. Franklin, I saw the beautiful portrait of Louis XVI, snuff-box size, presented by that king to the doctor. As the portrait is exactly such as is contained in the snuff-boxes presented by Crowned heads, one of which I have seen, it is probable this portrait of Louis was originally attached to the box in question, which has in the lapse of years been lost or given away by Dr. Franklin.'" H. B. Grigsby, History of the Virginia Federal Convention of 1788 (Virginia Historical Society Collections, Vols. 9-10), p. 264.

Similar statements appear in 2 Story on the Constitution, Boston, 1873, pp. 216-217, and in 5 Elliot's Debates on the Federal Constitution, p. 467.

The word "emolument" is defined in The Century Dictionary to mean "(1) the profit arising from office or employment; that which is received as a compensation for services, or which is annexed to the possession of office, as salary fees and perquisites. * * * (2) Profit; advantage; gain in general; that which promotes the good of any person or thing."

The term as used in statutes has been construed in several Supreme Court decisions. In McLean v. United States, 226 U.S. 374, the question arose whether forage and rations should be compensated for under a statute to award "all back pay and emoluments that would have been due and payable" to Major McLean, had he not resigned from the Army. In many respects the statute is similar to the German law under which Mr. Newkirk is being paid. The Court said, in part, -

"It certainly may be assumed that the act was not a simple gratuity. Public moneys are not appropriated as mere gifts. They are appropriated in recognition and reward of merit or in recompense for service, or, as it may be inferred in the present case, reparation for injustice done. * * * The act, in order to make its relief complete, treats the officer and compensates him as though he had been in actual service from the date of his retirement to the date of his reinstatement. * * * Whatever is directed to be settled - pay or emoluments - is for compensation, not for actual service but for attributed service. * * * It is difficult to deal with a distinction between pay and emoluments. Both are rewards or compensation, the one no more than the other, for services supposed. * * * emoluments were additive to pay * * * 'they are sometimes in the nature of compensation and sometimes in the nature of reimbursement'. * * * 'All' excludes the idea of limitation and the word 'emolument' is the most adequate that could have been used. It especially expresses the perquisites of an office, and its use in conjunction with 'pay' makes the restitution of the statute complete." 226 U.S. at 381-383.

In Hoyt v. United States, 10 How. 108 (1850), the following definition appears: "The term emoluments, that being more comprehensive, and embracing every species of compensation or pecuniary profit derived from a discharge of the duties of the office." And, in Sherburne v. United States, 16 Ct. Cl. 491, the court held that "* * * emoluments * * * are indirect or contingent remuneration, which may or may not be earned, and which is sometimes in the nature of compensation, and sometimes in the nature of reimbursement." (16 Ct. Cl. at 496.)

---

## FN7

Funk & Wagnall's College Standard Dictionary defines "emolument" as "the remuneration connected with an office or service * * *. General advantage; gain; profit".

Keeping in mind that the purpose of the clause was to prevent undue influence, it is my opinion that the term "emolument", as used in Article I, section 9, clause 8, of the Constitution, particularly since it is modified by the phrase "of any kind whatever", was intended to cover compensation of any sort arising out of an employment relationship with a foreign state. Undoubtedly, it would prohibit a person holding a position of trust or profit under the United States from receiving at the same time retirement pay, pensions, or annuities from a foreign government. Such benefits are unquestionably part of the emoluments of office and are well recognized as important elements in any contract of employment.

On the other hand, it is my opinion that the Constitutional provision would not prevent an officer of the United States from receiving damages arising from some wrongful act of a foreign state. Therefore, if all that Mr. Newkirk is receiving is damages for redress of past injuries, he should not be precluded from accepting them.

There is considerable force to the argument that the German laws involved were intended solely to redress wrongs of the Nazi regime by paying the injured party damages for breach of contract. The Republic of Germany acknowledged in the Bonn Convention "the obligation to assure * * * adequate compensation to persons persecuted for their political convictions, race, faith or ideology, who thereby have suffered damage to life, limb, health, liberty, property, their possessions or economic prospects * * *." Senate Executives Q and R, 82d Cong., 2d sess., Transmitting the Convention on Relations Between the Three Powers and the Federal Republic of Germany. The German laws under which Mr. Newkirk is being compensated clearly disclose by their titles that they award payments as indemnification for National Socialist wrongs. And certainly the payments made bear no relationship to services rendered, nor do they impose any obligations or duties upon the part of the recipient.

However, it is my opinion that the annuity payment of $263 a month for life to Mr. Newkirk is not exclusively a payment for damages. The annuity is in major part a payment intended to restore Mr. Newkirk to the financial position he would have enjoyed had he continued as a judge in the German Government until retirement. Under the Law of 1949, Mr. Newkirk has been awarded damages for economic loss for the period from 1933 to 1951. The 1951 law, amended and made applicable to persecutees living abroad in 1952, provides a comprehensive scheme for restoring eligible claimants to the positions they would have been entitled to had they not been prematurely retired. It grants a priority right of re-employment, if the claimant meets the legal requirements. However, the claimant was given an election; he could elect to retire in lieu of accepting reappointment, in which case he may demand an annuity. Mr. Newkirk chose this latter course. In the Determination of his claim (attached), the annuity was computed as follows:

"In accordance with the status to which the claimant is entitled, he may demand payment of an annuity commencing April 1, 1951, the amount of which shall be equal to the amount to which he would be entitled, if he had been re-employed, and simultaneously received the promotions which he missed, and then had retired from his new office on the effective date of the Federal Law on Indemnification for Civil Servants (April 1, 1951).

This scheme, for all ostensible purposes, treats Mr. Newkirk as any other retired civil servant. The annuity is for the rest of his life. In my opinion, such payments are emoluments within the Constitutional prohibition, aimed at preventing corruption, a clause which has received in other contexts a broad construction. For example, Attorney General Hoyt, in 24 Ops. A.G. 116, 118, held that "even a simple rememberance of courtesy * * * falls under the inclusion of "any present * * * of any kind whatever."

It is to be noted that emoluments or presents may be received with the "consent of Congress". Such consent has been obtained in many cases. Since means of relief are provided, that remedy should be pursued, and doubtful cases, such as this, should be resolved against holding a continuing compensation from a foreign state not covered by the Constitutional provision.

It is therefore my opinion that Mr. Newkirk should be required to make an election, and if he desires to continue to receive his annuity from the German Government, he should resign from public office.

---

That such provisions are probably of little effect was noted in 2 Story on the Constitution, pp. 216-217:

"The other clause, as to the acceptance of any emoluments, title or office, from foreign governments, is founded in a just jealousy of foreign influence of every sort. Whether, in a practical sense, it can produce much effect, has been thought doubtful. A patriot will not be likely to be seduced from his duties to his country by the acceptance of any title, or present, from a foreign power. An intriguing, or corrupt, agent will not be restrained from guilty machinations in the service of a foreign state by such constitutional restrictions."

Another factor cannot be overlooked. It might prove highly embarrassing to the Department of Justice should it come to the attention of Congress that a lawyer in the Claims Branch of the Office of Alien Property, handling claims to German property, was drawing a $263 monthly annuity for life from the German Government, and that the Attorney General had concluded that legislative consent to such an arrangement was unnecessary.

Of course, Mr. Newkirk has no election if the German laws fix his rights so that his annuity would continue to accrue to his account and could not be relinquished.